**No. 14-1414**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**
_____

**DANIELA SMEDLEY,**

*Petitioner-Appellee,*

*v.*

**MARK SMEDLEY,**

*Respondent-Appellant.*

_____

**Appeal from the United States District Court
for the Eastern District of North Carolina**
*The Honorable James C. Fox, Senior District Judge*
_____

**BRIEF OF APPELLEE**
_____

**Chad D. Hansen
Thurston H. Webb
Andrew W. Rinehart
KILPATRICK TOWNSEND &
  STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101
(336) 607-7494**

*Counsel for Appellee*

## <u>CORPORATE DISCLOSURE STATEMENT</u>
### (Fed. R. App. P. 26.1 and 4th Cir. R. 26.1)

Appellee Daniela Smedley makes the following disclosures:

1. Is Appellee a publicly held corporation or other publicly held entity?  ☐ YES  ☑ NO

2. Does Appellee have any parent corporations?  ☐ YES  ☑ NO

3. Is 10% or more of the stock of Appellee owned by a publicly held corporation or other publicly held entity?  ☐ YES  ☑ NO

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES  ☑ NO

5.  Is Appellee a trade association?  ☐ YES  ☑ NO

6. Does this case arise out of a bankruptcy proceeding?  ☐ YES  ☑ NO

/s/ Thurston H. Webb
Thurston H. Webb
KILPATRICK TOWNSEND &
   STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7352

*Counsel for Appellee Daniela Smedley*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .........................................................................................1

STATEMENT OF THE CASE.....................................................................3

I.     THE CHILDREN'S GERMAN ROOTS ........................................3

II.    THE FAMILY MOVES TO THE UNITED STATES. .................5

III.   MARK CHANGES HIS MIND AND INSTITUTES LEGAL
       PROCEEDINGS.............................................................................8

IV.    DANIELA AND THE CHILDREN BECOME FULLY
       INTEGRATED IN BAMBERG. ..................................................11

V.     MARK'S WRONGFUL RETENTION OF THE CHILDREN ...................12

VI.    THE CURRENT HAGUE PETITION.........................................14

SUMMARY OF THE ARGUMENT ..................................................15

ARGUMENT ..........................................................................................17

I.     THE DISTRICT COURT'S HABITUAL RESIDENCE HOLDING IS
       CORRECT. ...................................................................................17

       A.    Standard of Review .......................................................19

       B.    The District Court Correctly Accorded Comity to the Decision
             of the Bamberg Higher Regional Court. .............................20

             1.    The German Court did not err in failing to
                   determine habitual residence. ..........................22

             2.    The evidence before the German Court supports its
                   finding that Mark consented to the permanent
                   removal of the children..................................28

3.    Acquiescence is not at issue in this case, but if it is, it is satisfied. ...................................................32

II.    MARK PROVIDES NO SUPPORT FOR HIS REQUEST ON REMAND. ..................................................................................33

CONCLUSION .........................................................................................36

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Abbott*,
　560 U.S. 1 (2010)............................................................................32

*Anderson v. City of Bessemer City, N.C.*,
　470 U.S. 564 (1985)........................................................................31

*Asvesta v. Petroutsas*,
　580 F.3d 1000 (9th Cir. 2009) ................................................ *passim*

*Bader v. Kramer*,
　484 F.3d 666 (4th Cir. 2007)..........................................................17

*Belize Telecom, Ltd. v. Gov't of Belize*,
　528 F.3d 1298 (11th Cir. 2008) ......................................................20

*Cohn v. Bond*,
　953 F.2d 154 (4th Cir. 1991)...........................................................27

*Darín v. Olivero-Huffman*,
　746 F.3d 1 (1st Cir. 2014) .................................................. 28, 31, 33

*Diorinou v. Mezitis*,
　237 F.3d 133 (2d Cir. 2001)....................................................... 19, 26

*Edwards v. City of Goldsboro*,
　178 F.3d 231 (4th Cir. 1999)..........................................................34

*Friedrich v. Friedrich*,
　983 F.2d 1396 (6th Cir. 1993) ........................................................17

*Holland v. Big River Minerals Corp.*,
　181 F.3d 597 (4th Cir. 1999)..........................................................36

*Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*,
　347 F.3d 589 (5th Cir. 2003) ..........................................................20

*Maxwell v. Maxwell*,
　588 F.3d 245 (4th Cir. 2009)..........................................................18

*Medellín v. Texas*,
　552 U.S. 491 (2008)........................................................................23

*Miller v. Miller*,
　240 F.3d 392 (4th Cir. 2001)................................................. *passim*

*Nicolson v. Pappalardo*,
  605 F.3d 100 (1st Cir. 2010) ......................................................... 28, 33

*Remington Rand Corp.-Del. v. Bus. Sys. Inc.*,
  830 F.2d 1260 (3d Cir. 1987) ............................................................20

*United States v. Palacios*,
  677 F.3d 234 (4th Cir.), *cert. denied*,
  133 S.Ct. 124 (2012) ........................................................................34

*United States v. Sharp*,
  400 F. App'x 741 (4th Cir. 2010) ....................................................34

*Walker v. Walker*,
  701 F.3d 1110 (7th Cir. 2012), *cert. denied*,
  133 S.Ct. 1729 (2013) ......................................................................31

*Walton v. N.C. Dept. of Agric. & Consumer Servs.*,
  494 F. App'x 300 (4th Cir. 2012) ....................................................24

## Statutes and Treaties

42 U.S.C. § 11601 *et seq* (2012) ............................................................2

Hague Convention on the Civil Aspects of International Child Abduction,
  Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 ..................... 2, 17, 24, 25

## Rules

Fed. R. App. P. 28(a)(9)(A) ....................................................................34

Fed. R. App. P. 32(a)(5) ...........................................................................37

Fed. R. App. P. 32(a)(6) ...........................................................................37

Fed. R. App. P. 32(a)(7)(B)(iii) ...............................................................37

## Other Authorities

Elisa Pérez-Vera, *Explanatory Report by Elisa Pérez-Vera* ....................................25

John C. Reitz, *Why We Probably Cannot Adopt the German Advantage in Civil Procedure*, 75 Iowa L. Rev. 987 (1990) ........................................9

## INTRODUCTION

On August 6, 2013, Appellant Mark Smedley ("Mark") flew to Germany to pick up his two minor children, A.H.S. and G.A.S., to take them to the United States for three or four weeks. The children had lived exclusively with their mother, Appellee Daniela Smedley ("Daniela"), for the two years prior to this trip. Both children were excited about the trip as this was the first time in two years that Mark had made any effort to see the children.

Daniela, however, was wary that Mark had an ulterior motive behind this trip. Therefore, she requested that Mark agree to a timetable for when he would return the children. Mark readily agreed, and when he picked the children up in Germany, he handed Daniela a signed and notarized document wherein he promised to return the children on or about August 26, 2013.

Mark, however, did not keep his promise. Instead, he waited until after the time he was supposed to return the children and then sent Daniela a Facebook message in which he stated that, contrary to his signed and notarized promise, he was keeping the children in North Carolina and would not permit them to return to Germany.

Fortunately, Daniela had a legal recourse in which to seek the return of her children. Countries around the world have recognized that international parental abductions, such as Mark's abduction of the children here, are particularly harmful

to children.  In order to protect children from this harm, many countries, including both the United States and Germany, have signed the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 (the "Hague Convention").  The United States has implemented the Hague Convention through the enactment of the International Child Abduction Remedies Act ("ICARA"), 100 Pub. L. No. 300, 102 Stat. 437 (1988) (codified as amended at 42 U.S.C. § 11601 *et seq* (2012)).  Daniela thus filed a Hague petition in the United States District Court for the Eastern District of North Carolina, seeking the return of the children to Germany.

Mark's main argument before the district court for why his retention of the children was not wrongful was premised on the fact that Mark himself had sought to utilize the Hague Convention in 2011 after Daniela and the children left the United States to move to Germany, a move Mark originally gave consent to Daniela to make.  Through his German counsel, Mark filed a petition in Germany in 2011 that requested the return of the children to the United States.  But the German court denied Mark's petition.  After both parties had presented extensive evidence and made subsequent arguments, the German court ruled that the Hague Convention did not require the return of the children because Daniela had satisfied one of the Convention's "affirmative defenses," namely that Mark had consented to the children's permanent stay in Germany.  Far from an unjust or sham

proceeding, the German court's decision was based on thoughtful analysis and predicated on the extensive and detailed declarations contained in the record.

In opposition to Daniela's petition, Mark argued that notwithstanding the German court's decision, Daniela had wrongfully retained the children in Germany in 2011, which thus precluded their return to Germany now. But the district court rejected this argument based on its application of comity to the German court's decision. This extension of comity was correct and Mark's arguments to the contrary are baseless.

## STATEMENT OF THE CASE

## I.   THE CHILDREN'S GERMAN ROOTS

Mark, a member of the U.S. Army, initially met Daniela, a German citizen, while Mark was stationed in Germany. The two began a romantic relationship and, by March of 1999, were living together in Bamberg, a small German town where Daniela had lived her entire life. (App. 31, 41.) Daniela ultimately became pregnant, and, on May 24, 2000, Mark and Daniela were married in Germany pursuant to German law. (*Id.*) On June 8, 2000, Daniela gave birth to A.H.S., both her and Mark's first child. (App. 23.)

After the birth of A.H.S., the family continued to reside in Bamberg until 2002, when Mark was transferred to Fort Campbell, Kentucky. (App. 31, 41.)

Daniela and A.H.S. moved with Mark, where Mark and Daniela purchased a home near Fort Campbell in neighboring Tennessee.  (*Id.*)

Over the next two years, Mark was twice deployed, first to Afghanistan and then to Iraq.  (*Id.*)  During both of Mark's deployments, which together lasted over a year, Daniela and A.H.S. chose not to stay in the United States.  Rather, they moved back to Bamberg and lived with Daniela's family.  (*Id.*; T. 11[1].)

After his second deployment, Mark did not return to the United States. Instead, Mark was able to transfer to Germany, which allowed him to join Daniela and A.H.S. in Bamberg.  (T. 11.)  However, Mark and Daniela's relationship had become strained during his deployments, and the two separated shortly after Mark arrived in Bamberg.  (App. 27, 31.)  During their separation, which lasted until the end of 2004, Mark lived in the barracks, while Daniela and A.H.S. continued to live with Daniela's family.  (*Id.*)  Daniela and Mark then reconciled and, by the beginning of 2005, Mark again lived with Daniela and A.H.S. in Bamberg.  (App. 41.)

In December 2005, Daniela gave birth to the couple's second child, G.A.S. (*Id.*; App. 23.)  Except for a brief stay in Tennessee, Daniela and the two children continued to live in Bamberg for the next five years, including when Mark was

---

[1] Citations to "T." refer to portions of the record in the Joint Corrected Appendix paginated as "T."  They are included in the same Joint Corrected Appendix document as those portions of the record paginated as "App."

again deployed to Iraq.  (App. 31, 41; T. 11.)  While both children were dual

citizens of the United States and Germany and spoke both German and English, as

of August of 2010, the children had lived almost their entire lives in Germany,

with only brief stays in the United States.  (App. 23, 31-32.)

## II.    THE FAMILY MOVES TO THE UNITED STATES

On August 1, 2010, Mark was transferred from Germany to Jacksonville,

North Carolina.  (App. 23, 41.)  By this point, Mark and Daniela's relationship had

become significantly strained.  The two had long discussions regarding whether

they should stay together and all move to the United States, or if Daniela should

remain in Germany with the children.  (App. 31.)  While G.A.S. was too young to

understand that his parents were considering separating, A.H.S. understood that

Daniela was considering staying in Germany and conveyed to her parents that she

refused to leave Germany.  (*Id.*)  Ultimately, Daniela decided to join Mark in North

Carolina in an attempt to salvage the marriage.  (*Id.*)  However, A.H.S.'s strong

desire to remain in Germany prompted Daniela to consider leaving A.H.S. with

Daniela's mother in Bamberg, but Daniela ultimately decided to take both children

with her and join Mark in the United States.  (*Id.*)

While Mark and Daniela's marriage troubles were due to multiple factors, a

significant factor was their disagreement over how to raise their children.  (App.

34.)  Mark had spent a large portion of his children's lives overseas, and was

incapable of dealing well with issues that arose regarding the children, particularly with respect to discipline.  (*Id.*)  Mark beat both children with his hands, and at times beat A.H.S. with a belt.  (*Id.*)  Daniela reproached Mark each time he beat one of the children, although she was not always aware of such beatings when they occurred.  (*Id.*)

Even though Daniela and Mark hoped their marriage would survive, the move to North Carolina served only to further strain their relationship.  (App. 27, 32.)  Daniela was both homesick and lonely living in North Carolina, and she and Mark frequently discussed divorce.  (*Id.*)  By the beginning of 2011, Daniela and Mark no longer shared a room.  Daniela spent her nights sleeping on a couch while Mark slept in the couple's bed.  (*Id.*)  It had become clear to Daniela at this point that her marriage to Mark was over, and she even consulted several lawyers regarding divorce.  (*Id.*)

In May 2011, Daniela told Mark that she wanted to separate and move with the children back to Germany.  (*Id.*)  Because she did not want to interfere with the children's schooling, she informed Mark that she hoped to leave during the children's summer break in July.  (*Id.*)  Mark attempted to persuade Daniela to stay, but after many long and intense discussions, he ultimately agreed that Daniela would return to Germany with the children.  (*Id.*)  Mark insisted that Daniela take several weeks while in Germany to reconsider whether she wanted to separate and

Daniela agreed. (*Id.*) However, Daniela also made it clear that her intention was to stay in Germany and that she did not anticipate a change of heart. (*Id.*) Mark told Daniela that should she fail to change her mind, he would try to relocate to Germany to be close to his children. (*Id.*)

Daniela and the children flew to Germany on July 13, 2011. (App. 23, 42.) Mark purchased all three plane tickets. (App. 24, 33, 41.) Even though he knew Daniela and the children were likely to stay in Germany, he purchased round trip tickets for the common sense reason that they were cheaper than one way tickets. (App. 33.) Round trip tickets also allowed Mark to continue to hope that Daniela would change her mind and return to the United States with the children, even though Daniela had made it clear that this was unlikely. (*Id.*)

Consistent with what she told Mark, Daniela did not change her mind. During her first few weeks in Germany, Daniela spoke regularly with Mark and repeatedly told him that she had not changed her mind. (*Id.*) Daniela also informed Mark that she was taking steps to establish their lives in Bamberg, including initiating the process to enroll the children in school. (*Id.*) Mark, however, continued to ask Daniela to change her mind. (*Id.*) Finally, by the end of July 2011, Daniela informed Mark that she had not, and would not, change her mind and was going to remain in Germany with the children. (App. 28, 33.) Mark, while upset, agreed that the children would remain in Germany with

-7-

Daniela, so long as she allowed them to visit him in the United States. (App. 33.) Mark even informed the children of his consent to their remaining in Germany. (*Id.*) Daniela readily agreed to allow the children to visit Mark, as she did not want to prevent them from having a relationship with their father.

## III.   MARK CHANGES HIS MIND AND INSTITUTES LEGAL PROCEEDINGS

Despite initially agreeing that Daniela and the children could permanently move to Germany, Mark had a change of heart once he recognized that Daniela was not going to change her decision to stay. Mark hired a German attorney and, in October of 2011, submitted a petition in Germany under the Hague Convention for the return of the children to the United States. (App. 24, 46.) The petition was initially heard in the District Court of Bamberg. (App. 25, 42.) Mark attempted to attend the hearing, but was not permitted to board his flight from the United States because he had failed to renew his passport. (App. 43; T. 73.) After learning he was unable to fly to Germany, Mark had time in which to request that the District Court of Bamberg delay the hearing, but he chose not to do so. (T. 73.) Rather, Mark moved forward with the proceedings and relied on his hired German counsel to represent his interest. (App. 43; T. 73.) At the hearing, Mark's German counsel introduced evidence on Mark's behalf and made both factual and legal arguments before the court. (App. 25, 42-43; T. 73-74.)

On October 21, 2011, the District Court of Bamberg denied Mark's Hague petition.  (App. 25.)  It found that "sending the children back to the United State[s] would imply exposing them to a serious risk of physical or psychological harm" due to the children's testimony that Mark beat A.H.S., that A.H.S. was "permanently affected and is afraid of [Mark]", that there is a lack of any "viable" relationship between G.A.S. and Mark due to Mark's "uncontrolled and violent behavior," and that G.A.S. "is also afraid of his father."  (App. 25, 66A-66P.)  The court also found that neither child wanted to return to the United States, and both desired to remain in Germany with Daniela.  (App. 66A-66P.)

Mark, through his German counsel, appealed this decision to the Bamberg Higher Regional Court (the "German Court").  (App. 25.)  Unlike appellate courts in the United States, appellate courts in Germany function somewhat like a second trial court and hear evidence presented by the parties.  (App. 22-39); *see also* John C. Reitz, *Why We Probably Cannot Adopt the German Advantage in Civil Procedure*, 75 Iowa L. Rev. 987, 989 (1990) ("the first level of appeal in German courts is de novo and routinely includes rehearing of witnesses with regard to the crucial factual issues still in dispute").  The German Court heard Mark's appeal on November 29, 2011.  (App. 23.)  Mark did not attend this hearing.  (App. 25, 43.)  But, just as in the District Court of Bamberg, Mark was represented at the hearing

-9-

by his hired German counsel, who again introduced evidence and made arguments

on Mark's behalf.  (*Id*.)

On December 5, 2011, the German Court denied Mark's appeal, albeit on

grounds different than those found by the District Court of Bamberg.  Specifically,

the German Court held that:

> The repatriation request of [Mark] is erroneously brought as a
> wrongful removal or retention of children in the context of Art. 3 of
> [the Hague Convention], since there is no case of abduction.  [Mark]
> himself has admitted that he did agree with having [Daniela] and the
> children travel to Germany.  Thus, no wrongful removal can be
> assumed.  Ultimately, this is not decidedly claimed by [Mark].
> Therefore an unlawful retention cannot be ruled because in the
> opinion of the Senate [Mark] agreed with the permanent stay of the
> children and [Daniela] in Germany.

(App. 22-23, 26.)

At the same time that Mark was pursuing his Hague petition filed in

Germany, and despite the fact that the children were not in North Carolina, Mark

also sought and was granted an *ex parte* order from the District Court of Onslow

County, North Carolina, that purported to grant Mark temporary custody, care and

control of the children.  (App. 42.)  However, Daniela was not served with the

complaint and civil summons until December 21, 2011.  (T. 67; *see also* App. 34.)

On October 7, 2011, the court entered an amended *ex parte* order that provisionally

found that North Carolina was the "habitual residence" of the children pursuant to

the Hague Convention.  (App. 42.)  Mark failed to serve Daniela with this or any

other order from the Onslow County court.  (T. 47-52, 65-67.)

## IV.  DANIELA AND THE CHILDREN BECOME FULLY INTEGRATED IN BAMBERG

After leaving the United States in July 2011, and until Mark's wrongful

retention of the children in August 2013, Daniela and the children lived in

Bamberg.  (App. 43-44.)  Despite his earlier promise that he would try and move to

Germany, Mark not only continued to live in the United States, but he did not once

come to Germany to visit his children.  (App. 44.)  Mark also paid only meager

child support payments for six months of these two years, and otherwise failed to

make any financial contribution to assist Daniela in caring for the children.  (App.

16.)  The children's lives became fully integrated in Bamberg: they went to school

in Bamberg, they had friends in Bamberg, they spent time with Daniela's extended

family, and they became active in local church activities.  (App. 44; T. 104-19.)

Daniela and Mark also decided to officially end their marriage.  On May 7,

2012, Daniela and Mark obtained a legal divorce decree in the District Court of

Bamberg.  (App. 43.)  Both Mark and Daniela were represented by German

counsel during the divorce proceedings.  (App. 39F.)  Through his counsel, Mark

represented that he and Daniela had been separated since February 2011, five

months prior to Daniela and the children's move to Germany.  (App. 39G, 43.)

During the divorce proceedings, Daniela chose not to seek sole custody of the children. (App. 43; T. 14.) Even though she lived far apart from Mark, Daniela did not believe it was right to take away all of Mark's parental rights. (*Id.*) Mark also did not seek sole custody of the children. Thus, consistent with Germany law, the court ordered that "both parties will share the custody of their children." (App. 39H.) The court, however, directed that the children were to live with Daniela in Bamberg. (T. 14.) Mark has never sought to modify this custody order in Germany, nor has he ever disputed its validity or the jurisdiction of the court to enter a custody order. (App. 44; T. 61.)

## V.    MARK'S WRONGFUL RETENTION OF THE CHILDREN

On June 20, 2013, Daniela agreed to let the children fly to the United States to visit their father. The plan was for the children to fly to and from the United States on "space available" flights through the United States military. (App. 44.) By taking "space available" flights, the exact days the children would fly were unknown, but Mark and Daniela agreed that the visit would last three to four weeks. (*Id.*)

Daniela was worried that Mark would keep the children in the United States indefinitely. She therefore requested that Mark execute a notarized document stating when he would pick up and return the children. (*Id.*) On August 1, 2013, Mark signed a notarized document stating that he would pick up the children "on

or about 6 Aug 2013" and that the children "will be returning on or about 26 Aug 2013 unless [Daniela] is otherwise notified."  (App. 44; T. 19, 63[2].)  The language "on or about" and "unless [Daniela] is otherwise notified" was necessary due to the children taking "space available" flights through the United States military.  (*Id.*)  Mark then picked the children up in Germany on August 6, 2013, and flew back with them to North Carolina.  (App. 44.)

On August 27, 2013, Mark sent a Facebook message to Daniela stating that, contrary to the notarized document he signed earlier that month, he was going to permanently retain the children in the United States and would not permit them to return to Germany.  (App. 45.)  Mark later claimed he refused to return the children because he was concerned about the children's well-being.  (App. 44.)  This *post hoc* "concern" was, according to Mark, based on three factors:  (1) the children had not seen a dentist since returning to Germany; (2) G.A.S. did not speak English well; and (3) A.H.S. was not performing well in school.  (App. 44-45.)  However, when Mark took the children to a pediatrician, the pediatrician had no significant concerns with the children's health and wellbeing.  (App. 45.)  Mark also claimed that he believed he was acting pursuant to the custody order issued by the Onslow County court.  (*Id.*)  However, Mark has also acknowledged that the

---

[2] A photo copy of the document is available in the district court record at Dkt. # 1-12 at 2.

Onslow County court's custody order was issued *after* the children moved to Germany and *while* his German Hague petition was pending. (App. 39N-39O.)

## VI.  THE CURRENT HAGUE PETITION

When Daniela received Mark's Facebook message that he refused to return the children, she immediately took steps to begin a Hague Convention application. (T. 21-22.) On April 7, 2014, Daniela filed her Hague petition in the United States District Court for the Eastern District of North Carolina. (App. 7-21.)

The district court held a hearing on the Hague petition on April 22, 2014. Daniela flew in from Germany for the hearing, a flight she could only afford because her church raised the money by holding a benefit concert and other fundraisers. (T. 25-26.) Both Daniela and Mark testified at the hearing, and both children were interviewed on the record *in camera*. (App. 40.) Both parties then submitted additional briefing on April 24, 2014. (*Id.*; App. 39DD-39ZZ.) On April 28, 2014, the district court allowed the Hague Petition, but delayed its enforcement until May 1, 2014, to allow Mark time to apply for an emergency stay from this Court. (App. 62-63.) Mark filed his emergency stay on April 30, 2014 (App. Dkt. #3), which this Court subsequently denied (App. Dkt. #8). On May 2, 2014, pursuant to the district court's order, Daniela returned to Germany with both children, where they remain today.

## SUMMARY OF THE ARGUMENT

The district court's order should be affirmed for several reasons.

*First*, the district court's habitual residence holding is correct. The district court correctly extended comity to the decision of the German Court wherein that court found Mark consented to the children's permanent move to Germany. The German Court correctly applied the Hague Convention and, based on an affirmative defense stated in Chapter 13, denied Mark's Hague petition. Thus, based on this Court's decision in *Miller v. Miller*, 240 F.3d 392 (4th Cir. 2001), it was within the district court's discretion to extend comity to the German Court's decision.

*Second*, Mark's argument that the German Court's decision is not entitled to comity because it failed to determine the children's habitual residence is contrary to the plain language of the Hague Convention. While habitual residence is ordinarily a required finding every time a court determines a child was wrongfully removed or retained, the Hague Convention does not forbid courts to deny Hague petitions based on affirmative defenses that would negate a finding of wrongful removal or retention. Here, the German Court correctly denied Mark's Hague petition based on the application of Article 13, just as American courts correctly deny summary judgment based on affirmative defenses without first determining liability.

-15-

*Third*, Mark's argument that the German Court's decision does not support the finding that Mark consented to the children's retention in Germany is meritless. The German Court's decision is replete with findings that Mark knew Daniela and the children were traveling to Germany with the intent to stay, that he consented to this move, and that the only decision Daniela made while in Germany was her decision to not change her mind.

*Fourth*, Mark's argument that he did not acquiesce to the children's retention in Germany is irrelevant. The district court found the German Court made no such finding and Daniela has not argued that the German Court made such a finding. Nevertheless, the record establishes that, through his subsequent participation in his German divorce proceedings—which entered a custody order—Mark has acquiesced to Daniela's retention of the children in Germany.

*Finally*, Mark provides no support for his request on remand. In his brief, Mark fails to argue that he satisfied all elements of a claim for wrongful removal in 2011, including that the children's habitual residence was the United States. Mark has thus abandoned this argument.

Accordingly, this Court should affirm the district court's order allowing Daniela's Hague petition.

## ARGUMENT

### I.  THE DISTRICT COURT'S HABITUAL RESIDENCE HOLDING IS CORRECT.

The primary purpose of the Hague Convention is "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993)).  In applying the Hague Convention, courts do not inquire into the merits of the underlying custody case.  Rather, the court's inquiry is limited to where the custody decision will be made. *Id.*

Under Article 12 of the Hague Convention, courts are required to order the return of a child that has been "wrongfully removed or retained" as defined under Article 3.  T.I.A.S. No. 11,670, at *4.  To establish a *prima facie* case of wrongful removal or retention under Article 3, a petitioner must establish three elements by a preponderance of the evidence:  (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal or retention; (2) the removal or retention was in breach of the petitioner's custody rights under the law of his home country; and (3) the petitioner was exercising those rights at the time of removal or retention. *Id.* at *2; *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007).

On appeal, Mark does not dispute that the district court correctly held that Daniela satisfied the second and third elements of a *prima facie* case of wrongful retention. Mark's appeal instead focuses solely on the district court's holding that Germany was the children's habitual residence.

This Court has established a two-part framework in determining a child's habitual residence. *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009). First, the court examines whether the parents shared a settled intent to abandon the former country of residence. *Id.* With respect to this factor, "a parent cannot create a new habitual residence by wrongfully removing and sequestering a child." *Miller*, 240 F.3d at 400. Second, the court examines the extent of the child's acclimatization to the new country of residence. *Maxwell*, 588 F.3d at 251.

The district court found, and Mark does not dispute, that the children were sufficiently acclimated to Germany to find that Germany is the children's habitual residence, "notwithstanding the parents' intent." (App. 50-51.) Instead, Mark focuses exclusively on the district court's decision that Daniela did not wrongfully remove and sequester the children when they moved to Germany in 2011. Mark contends that the district court erred in extending comity to the opinion of the Bamberg Higher Regional Court, which found Daniela's retention of the children in Germany was not wrongful based on Mark's consent to Daniela moving to

Germany with the children.  Mark insists that this decision is not entitled to deference because it misapplied both the facts and the law.  (Mark Br. 13-24.)

As explained below, the district court correctly accorded comity to the German Court's decision that Daniela did not wrongfully remove or retain the children in 2011.  Therefore, this Court should affirm the district court's allowance of Daniela's petition under the Hague Convention.

### A.    Standard of Review

In an action pursuant to the ICARA and the Hague Convention, this Court reviews the district court's findings of fact for clear error, and its conclusions regarding principles of domestic, foreign, and international law *de novo*.  *Miller*, 240 F.3d at 399.  However, this Court has not previously addressed the standard of review applicable to a district court's extension of comity to a foreign court's Hague decision.  The Second Circuit in *Diorinou v. Mezitis*, 237 F.3d 133, 138-39 (2d Cir. 2001), found that the standard of review in this context is *de novo*.  In contrast, the Ninth Circuit has suggested that the proper standard of review is for an abuse of discretion.  *Asvesta v. Petroutsas*, 580 F.3d 1000, 1009 (9th Cir. 2009).

This Court should review the district court's extension of comity to the German Court's decision for an abuse of discretion.  As this Court stated in *Miller*, there is no reason not to defer to the "reasonable disposition" reached by a foreign court in a Hague proceeding.  240 F.3d at 400-01.  Whether a foreign court's

disposition is "reasonable" is not a pure question of law, but rather is a discretionary decision that this Court need not examine anew. This is consistent with other courts' interpretation of whether to extend comity to foreign court decisions outside the Hague context, where courts examine the "fairness" of the foreign court proceedings. *See, e.g.*, *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1303 (11th Cir. 2008) ("This Court also reviews a district court's grant or denial of comity to a foreign judgment for abuse of discretion."); *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 593 (5th Cir. 2003) (same); *Remington Rand Corp.-Del. v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987) (same). However, this Court should affirm the district court's order irrespective of the standard of review it applies.

### B. The District Court Correctly Accorded Comity to the Decision of the Bamberg Higher Regional Court.

The sole error raised by Mark on appeal is that the district court improperly accorded comity to the decision of the German Court. (Mark Br. 13-24.) However, Mark relies almost exclusively on non-Fourth Circuit cases and ignores completely that the district court's extension of comity to the German Court's decision is entirely consistent with *this* Court's precedent.

In *Miller v. Miller*, this Court stated that while foreign court judgments "are not entitled to the protection of full faith and credit, . . . American courts will normally accord considerable deference to foreign adjudications as a matter of

-20-

comity." 240 F.3d at 400. Noting that "comity is at the heart of the Hague Convention," this Court then deferred to the "reasonable disposition" of the Ontario Court of Appeal. *Id.* at 400-401. The Court in *Miller* did not base its extension of comity on an in-depth review of the Canadian opinion.[3] Nor did the Court evaluate the Canadian court's analysis and reasoning. Rather, it simply extended comity to the Canadian court's opinion because it was "reasonable" for that court to rely on Canadian conflict of law principles. *Id.*

Here, consistent with the deference shown by this Court in *Miller*, the district court accorded comity to the German Court's decision. The German Court relied on the Hague Convention, specifically Article 13, when it denied Mark's petition. (App. 26.) *Miller* does not dictate that the German Court's reliance on Article 13 be unassailable, only that it was "reasonable." Clearly, it was reasonable for the German Court to deny Mark's Hague petition based on the language of the Hague Convention itself. This Court thus need not consider whether the district court correctly evaluated certain portions of the German Court's decision, and should affirm the district court on the simple basis that the German Court's reliance on the Hague Convention was reasonable.

Mark, however, completely ignores the extremely deferential standard this Court established in *Miller*. Instead, Mark's argument is premised on his un-stated

---

[3] In a footnote, the Court did address certain concerns about the opinion, but only in response to issues raised by the concurring opinion. *See id.* at 400 n.11.

suggestion that this Court adopt the Ninth Circuit's test for determining when to accord comity to a foreign court's Hague decision. In *Asvesta v. Petroutsas*, the Ninth Circuit stated that it would defer to a foreign court's Hague Convention determinations unless "it clearly misinterprets the Hague Convention, contravenes the Convention's fundamental premises or objectives, or fails to meet a minimum standard of reasonableness." 580 F.3d at 1014. For sure, this rule is still extremely deferential to the Hague decisions of foreign courts, leans strongly in favor of affording comity, and is similar to the standard established by *Miller*. However, the court in *Asvesta* undertook a considerably more detailed analysis than that employed and suggested by *Miller*.

To the extent the district court was required to apply this rule and conduct a detailed analysis—and it was not under *Miller*—Mark raises three arguments for why the district court erred in according comity to the German Court's decision. Mark's arguments, however, depend entirely on an almost *de novo* review of the German Court's decision. *Asvesta* does not require such a high standard of review of the German Court's decision. *Id.* But even if it did, none of Mark's arguments have merit.

### 1. The German Court did not err in failing to determine habitual residence.

Mark first contends that the German Court's decision is not entitled to any deference because it failed to determine the children's habitual residence. (Mark

Br. 14-16.)  The district court correctly rejected this argument because the German

Court's decision did not "clearly misinterpret[] the Hague Convention" when it

"left open" the question of the children's habitual residence.  (App. 26.)  Rather,

the German Court complied fully with the provisions of the Hague Convention

when it denied Mark's Hague petition.

   "The interpretation of a treaty, like the interpretation of a statute, begins with

its text."  *Medellín v. Texas*, 552 U.S. 491, 506 (2008).  The plain language of the

Hague Convention does not require a court to determine a child's habitual

residence in every instance.  Article 12 requires courts to order the return of a child

who is "wrongfully" removed or retained as that term is defined under Article 3.

*See supra* p. 17.  Of course, if a court applies Article 12 and determines that a

retention is "wrongful," the court must have first undertaken an Article 3 analysis,

including establishing the child's habitual residence.  However, the Hague

Convention is not limited solely to Articles 3 and 12.  "Articles 3, 12 *and 13* are

the main provisions that courts of contracting states must apply in adjudicating

Hague petitions."  *Asvesta*, 580 F.3d at 1004 (emphasis added).  Article 13

establishes several affirmative defenses, whereby *even if* a removal or retention is

wrongful, the state is not bound to order the return of the child.  *Id.*  Specifically,

Article 13 states:

> Notwithstanding the provisions of the preceding Article, the judicial
> or administrative authority of the requested State is not bound to order

the return of the child if the person, institution or other body which
opposes its return establishes that—

> (a) the person, institution or other body having the care of the
> person of the child was not actually exercising the custody
> rights at the time of removal or retention, or had consented to or
> subsequently acquiesced in the removal or retention; or
> (b) there is a grave risk that his or her return would expose the
> child to physical or psychological harm or otherwise place the
> child in an intolerable situation.

T.I.A.S. No. 11,670, at *4-5. Therefore, a court is not bound to order the return of

a child if the petitioner "had consented to" the retention, irrespective of whether

the retention was wrongful.

Contrary to Mark's suggestion, the plain language of the Hague Convention

does not require a court to first apply Article 3, then apply Article 12, and only

then examine whether any of Article 13's affirmative defenses apply. Nowhere

does Article 13 state that a party can only raise these affirmative defenses after

determining the child's "habitual residence." Nor does it state that the child's

"habitual residence" affects the analysis of any of these affirmative defenses.

Indeed, such a requirement would be highly inefficient and pointless. It makes

sense for a court, which believes a respondent has established one of Article 13's

affirmative defenses, to limit its analysis to this point. This is precisely why

American courts often grant summary judgment on the basis of an affirmative

defense after assuming a plaintiff has established liability. *See, e.g.*, *Walton v.*

*N.C. Dept. of Agric. & Consumer Servs.*, 494 F. App'x 300, 301 (4th Cir. 2012)

(affirming grant of summary judgment based on affirmative defense when court
assumed without deciding that plaintiff could satisfy three elements of her claim).

The only mention of "habitual residence" in Article 13 is in its last portion,
wherein it states that courts are required to consider "information relating to the
social background of the child provided by the Central Authority or other
competent authority of the child's habitual residence." T.I.A.S. No. 11,670, at *5.
But again, this does not require a court to first determine habitual residence. This
provision is only relevant if there is actual "information relating to the social
background of the child," which is not the case for many Hague petitions. *See*
Elisa Pérez-Vera, *Explanatory Report by Elisa Pérez-Vera* ¶ 117 ("The third
paragraph [of Article 13] contains a very different provision which is in fact
procedural in nature."). Further, by mentioning *both* the Central Authority (a
government-designed agency within each Hague Convention signatory county that
handles child abduction issues) *and* other competent authorities of a child's
habitual residence, this provision is merely informing the court that it must take
into account any social background information provided to it.

Indeed, Mark has not, and cannot, cite any authority stating that the Hague
Convention *requires* a court to determine habitual residence before moving to an
affirmative defense under Article 13. Contrary to Mark's suggestion (Mark Br.
16), the Ninth Circuit in *Asvesta* did not hold that a habitual residence

-25-

determination is always required under the Hague Convention.  Rather, the Ninth

Circuit held that the Greek court's *Article 3 determination* was not credible

because it failed to find habitual residence, a required element under Article 3.  580

F.3d at 1016-18.  Indeed, even Mark admits in his brief that a court's determination

of habitual residence is simply "*ordinarily* a critical element" to a Hague petition

analysis.  (Mark Br. 10-11) (emphasis added).

The Second Circuit's decision in *Diorinou v. Mezitis*, 237 F.3d 133 (2d Cir.

2001), is illustrative and demonstrates that Mark's argument is baseless.  There, the

Second Circuit accorded comity to a Greek decision that denied a Hague petition

based upon a showing of several Article 13 defenses.  Just as here, the Greek

decision did not first determine habitual residence before applying Article 13.  The

Second Circuit did not find the failure to first determine habitual residence a clear

misinterpretation of the Hague Convention.  Rather, it saw "no reason not to defer

to the Greek courts' fundamental ruling" and affirmed the district court's extension

of comity to the Greek decision.  *Id.* at 145.  Furthermore, even though the court

was "given pause by some aspects of" the Greek decision, it saw "no reason" to

avoid giving the decision deference.  *Id.*

Just like the Greek court in *Diorinou*, the German Court here correctly

applied the plain language of the Hague Convention.  It determined that the issue

of the children's habitual residence could "remain open" because Daniela

-26-

established an affirmative defense under Article 13(a), namely that at the time she and the children left the United States, Mark "agreed with the permanent stay of the children and the Respondent in Germany." (App. 26.) This analysis is consistent with the plain language of the Hague Convention. And even if this Court is "given pause" by the German Court's decision, this does not mean the German Court's decision is not worthy of deference.

In any event, Mark has failed completely to show that had the German Court decided the children's habitual residence, this would have changed its decision to deny Mark's Hague petition. Indeed, even if the German Court had found habitual residence, nothing suggests this would have changed its Article 13 analysis. Mark's suggestion (Mark Br. 16) that the German Court would have been "more reluctant to find that the defenses of Article 13 applied" had it found North Carolina was the children's habitual residence is completely without support and divorced from Article 13's plain language. Therefore, any error by the German Court is harmless and does not support reversing the district court's grant of comity. *See Cohn v. Bond*, 953 F.2d 154, 160 (4th Cir. 1991) (harmless error is not grounds for remand or reversal).

**2.     The evidence before the German Court supports its finding that Mark consented to the permanent removal of the children.**

Mark next argues that the German Court's decision does not support its factual finding that Mark consented to Daniela permanently moving to Germany with the children.  (Mark Br. 17-21.)  This argument is baseless and divorced from the evidence before the German Court.

As American courts have interpreted "consent" under Article 13—which does not actually bind German court's interpretation of the same provision— "[c]onsent may be evidenced by the petitioner's statements or conduct, which can be rather informal."  *Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010). Courts take into account "[w]hat the petitioner actually contemplated and agreed to, as well as the nature and scope of the petitioner's consent—including any conditions or limitations."  *Darín v. Olivero-Huffman*, 746 F.3d 1, 15 (1st Cir. 2014).  With American court's interpretation of "consent" in mind, it is clear the district court did not err in holding the German Court's application of the consent defense did not "fail[] to meet a *minimum standard* of reasonableness."  *Asvesta*, 580 F.3d at 1014 (emphasis added).

The German Court held that Mark gave consent based on its findings that: Daniela "wanted to go back to Germany with the children"; Daniela and the children flew to Germany "in a context where [Mark] knew exactly that she

-28-

wanted to stay with the children in Germany"; and Mark "accepted that, although he always hoped that she . . . would reconsider her decision."  (App. 27.) Daniela's testimony, in turn, supported each of these findings.

*First*, Daniela's testimony, as presented by the German Court in its decision, supports the finding that Mark was aware that when Daniela and the children left the United States, she wanted to leave the United States and intended to stay in Germany.  Daniela testified that she told Mark in January 2011 that "our marriage had ended."  She then stated that:

> In May 2011, I had a conversation with the Petitioner.  I told the Petitioner that I wanted to separate from him and that I wanted to go back to Germany, during the school holidays.  The school holidays would start by late June 2011.  The Petitioner repeatedly tried to persuade me, but it was too late.  In May 2011 I told the Petitioner that I would definitely go back to Germany. I also told him that I was taking the children with me.

(App. 32.)  She further testified that "[t]he Petitioner had already given me permission to remain in Germany.  He had also given this permission to [A.H.S.]." (App. 33.)  This testimony shows that Mark was aware that Daniela left the United States with the intent to stay in Germany.  Mark consented to Daniela's decision both implicitly and explicitly by purchasing plane tickets for Daniela and the children to fly to Germany with the purpose of staying.

*Second*, Daniela' testimony made it clear that the "decision" she made while in Germany was a decision to *not change her mind* about leaving Mark.  She

testified that she "agreed on a reflection period of four weeks with the Petitioner."
(*Id.*)  She stated that it was Mark who "was concerned that I had not made a final
decision when we left from USA to Germany."  (App. 32.)  Indeed, she stated that
when she talked to Mark during this reflection period, she repeatedly "pointed out
that I had not changed my decision."  (App. 33.)  Therefore, there was ample
evidence for the German Court to find that Mark knew and accepted that Daniela
intended to stay in Germany, and simply hoped she would reconsider her decision.

Mark's argument that Daniela's testimony does not support the German
Court's conclusion is based largely on a complete refusal to acknowledge the
above testimony.  Indeed, Mark relies on selective quotes that hide the full impact
of Daniela's testimony.  But as shown above, the German Court's findings
unquestionably satisfy a "*minimum standard* of reasonableness."  *Asvesta*, 580
F.3d at 1014 (emphasis added).

Mark also argues that he only consented to Daniela traveling to Germany on
the condition that she agree to return to North Carolina.  (Mark Br. 20.)  But this
argument is premised entirely on Mark's representations to the German Court,
which that court found were "not credible" based on Mark's failure to provide any
details, his attempt to conceal his prior knowledge, and that his testimony was
inconsistent with that of the children.  (App. 27-28.)  It is reasonable for the
German Court to have made a credibility determination between Mark and

Daniela, and to find Mark's testimony not credible.  Indeed, American courts give

the original finder of fact significant deference with respect to determinations of

credibility.  *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575

(1985).

Finally, *Asvesta* is not, as Mark contends, "virtually indistinguishable from

the present case."  (Mark Br. 19.)  The Ninth Circuit in *Asvesta* rejected a Greek

court's finding that the respondent had consented to the child's removal and

permanent stay in Greece because the evidence relied upon by the Greek court, a

note that gave limited consent "to travel with the child from November 8, 2005, to

December 8, 2005," *specifically contradicted* that finding.  580 F.3d at 1019.  In

contrast, the German Court here rejected Mark's testimony as unreliable, and

rested its finding on testimony from Daniela and the children that directly

*supported* the Court's finding.

Further, the two other cases Mark cites are also distinguishable.  The First

Circuit's opinion in *Darín v. Olivero-Huffman*, 746 F.3d at 10, did not even

involve consent, but rather a mother who, after traveling abroad, informed the

father—for the first time—that she and her son would not return.  And in *Walker v.

Walker*, 701 F.3d 1110, 1123 (7th Cir. 2012), *cert. denied*, 133 S.Ct. 1729 (2013),

the Seventh Circuit reversed the district court's finding of consent because the

evidence it relied upon was merely an opening offer in a negotiation that conceded

nothing and was rendered null by the parties' inability to come to an agreement. Neither of these cases are similar to that here, where Mark gave consent and then changed his mind after Daniela had left with the children. And in any event, these cases involve American courts' interpretation of "consent," and German courts are not required to follow the same interpretation. *See Abbott v. Abbott*, 560 U.S. 1, 17 (2010) (acknowledging that foreign courts may have differing or even contrary interpretations of the Hague Convention). Rather, all that is at issue here is whether the German Court's decision "fails to meet a minimum standard of reasonableness," *Asvesta*, 580 F.3d at 1014, a standard Mark has failed to satisfy.

### 3. Acquiescence is not at issue in this case, but if it is, it is satisfied.

Mark's third and final argument, that there was no evidence before the German Court that Mark acquiesced to Daniela's retention of the children (Mark Br. 21-22), is wholly irrelevant. The district court held that the German Court *did not* find that Mark acquiesced to the children's removal (App. 58), and Daniela has never argued that Mark acquiesced. This argument is thus inapplicable.

In any event, the record shows that Mark *did* acquiesce to Daniela's retention of the children in Germany. As Mark himself points out in his brief, "clear-cut, formal acquiescence" is shown through such conduct "as a consent order by a non-U.S. parent agreeing to let a state court decide final custody." (Mark Br. 22) (quoting *Darín*, 746 F.3d at 16); *see also Nicolson*, 605 F.3d at 107

-32-

("[A] clear and formal *consent order* by the non-U.S. parent agreeing to let a state court decide final custody would, both linguistically and for policy reasons, warrant treatment as acquiescence under the Hague Convention.").  Here, during the divorce proceedings in Germany in 2012—in which Mark participated through his German counsel—Mark agreed to let the District Court of Bamberg enter a custody order that granted both he and Daniela joint custody over the children and ordered that the children would live primarily with Daniela.  (App. 39F-39G; T. 14.)  Therefore, even if the German Court erred by not determining the children's habitual residence, Mark has acquiesced to Daniela's retention of the children in Germany through his participation in the later German custody proceedings.

## II.    MARK PROVIDES NO SUPPORT FOR HIS REQUEST ON REMAND.

In a final two sentence argument, Mark requests this Court remand with instructions for the district court to determine the habitual residence of the children "viewed with the understanding that [Daniela's] retention of the children in 2011, and their subsequent time in Germany, were undoubtedly wrongful under the Hague Convention."  (Mark Br. 24.)  Mark's brief, however, does not address whether Daniela's retention of the children in 2011 was wrongful.  Mark has thus abandoned these arguments and is not entitled to this relief.

"Federal Rule of Appellate Procedure 28(a)(9)(A) requires that the argument section of an appellant's opening brief must contain the 'appellant's contentions

and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies….'  Failure to comply with the specific dictates of this rule with respect to a particular claim triggers abandonment of that claim on appeal." *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999); *see also United States v. Sharp*, 400 F. App'x 741, 749 n.5 (4th Cir. 2010) (holding that Rule 28 requires that this Court not consider arguments based solely on a "bare allegation" where appellant "makes no substantive argument in his brief supporting this proposition").

Daniela's retention in 2011 was only wrongful if Mark satisfied the three elements of a *prima facie* case under Article 3.  *See supra* p. 17.  Mark fails to make any argument before this Court—or even state in his brief—that (1) Daniela's retention of the children in Germany in 2011 was in breach of Mark's custody rights under the law of North Carolina, and (2) that Mark was exercising those rights at the time Daniela left for Germany.  Mark has therefore waived these arguments and is not entitled to this relief.  *See United States v. Palacios*, 677 F.3d 234, 244 n.5 (4th Cir.), *cert. denied*, 133 S.Ct. 124 (2012) ("[Appellant] did not raise this contention in his opening brief and, as such, has waived it.").

Furthermore, in order for the Court to find that Daniela's retention in 2011 was wrongful, Mark is also required to show that the children's habitual residence in 2011 was the United States.  But in his brief, Mark simply makes the cursory

-34-

assertion that the German Court "would have been compelled to find that [the children's] habitual residence was North Carolina, the place the family moved to and had lived in for almost a year." (Mark Br. 15.) As noted above, a finding of habitual residence requires the court to examine *both* whether the parents shared a settled intent to abandon the former country of residency (here Germany) and the extent of the child's acclimatization to the new country of residency (here the United States). Mark was thus obligated to explain that both Mark and Daniela shared an intent to abandon Germany and that the children were sufficiently acclimated to North Carolina. No such explanation was offered in Mark's brief. Mark has therefore abandoned this argument by failing to explain on appeal *why* North Carolina was the children's habitual residence beyond his cursory statement that the family had moved there and lived there for a year.

In any event, Mark has no basis to now make this argument. He did not present any evidence before the district court in support of an argument that the children were sufficiently acclimated to the United States *in 2011* to establish the United States as their habitual residence. Rather, Mark is now asking for relief that he did not even try to establish in the district court. This Court should not afford Mark relief he failed to seek before the district court. *See Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605 (4th Cir. 1999) ("Generally, issues that were not raised in the district court will not be addressed on appeal.").

-35-

## **CONCLUSION**

This Court should affirm the district court's allowance of Daniela's petition.

Respectfully submitted,

/s/ Thurston H. Webb
Chad D. Hansen
Thurston H. Webb
Andy W. Rinehart
KILPATRICK TOWNSEND &
    STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101
(336) 607-7494

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENT

1      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(iii) because this brief contains 8,461 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using MS Word 2010 in Times New Roman 14-point font.

This the 21st day of July, 2014.

/s/ Thurston H. Webb
Thurston H. Webb
KILPATRICK TOWNSEND &
    STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7494

Counsel for Appellee

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System. Counsel for all parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF System.

<u>/s/ Thurston H. Webb</u>
Thurston H. Webb
KILPATRICK TOWNSEND &
   STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7494

*Counsel for Appellee*